HILER H. HORTON v. FRANK A. SEYMOUR and Another.[1]

April 5, 1901.

Nos. 12,448—(228).

### Statute of Limitations—Demand.

Where it appears from a contract that it was the intention of the parties thereto that the money or claim which is the subject-matter thereof was to be paid upon a demand in fact, the statute of limitations does not begin to run until an actual demand for payment is made.

### Finding not Sustained by Evidence.

The finding and decision of the trial court to the effect that the plaintiff's claim is barred by the statute of limitations are not sustained by the evidence.

Hiler H. Horton, as receiver of Walker, Judd & Veazie, appealed to the district court for Ramsey county from the disallowance of a claim against the Bank of Minnesota by the receivers of the bank. The case was tried before O. B. Lewis, J., who found in favor of defendants. From a judgment entered pursuant to the findings, plaintiff appealed. Reversed.

*Warner & Lawrence*, for appellant.

*Young & Lightner*, for respondents.

START, C. J.

The Bank of Minnesota became insolvent, and the respondents were appointed receivers of its property December 23, 1896. The appellant, as the receiver of Walker, Judd & Veazie, on March 20, 1897, made proof of, and filed with the respondents, a claim against the Bank of Minnesota amounting to $8,468.55, which was disallowed by them. Thereupon he appealed to the district court of the county of Ramsey. In the district court the appellant made and served a formal complaint setting out the basis of his claim against the bank, and the respondents answered, putting in issue certain of the allegations of the complaint, and pleading the statute of limitations, and a counterclaim arising from an alleged overdraft. There was no formal reply, but the parties stipulated

[1] Reported in 85 N. W. 551.

as follows: "It is taken as denied that there was an overdraft, and taken as denied that there was a promise to repay the overdraft, and a denial that this cause of action is outlawed; these matters being considered in issue as if a reply had been served."

The cause was tried by the court without a jury, and findings of fact made, among others, to the effect following: The plaintiff's alleged cause of action against the bank and its receivers did not accrue within six years prior to the commencement of the action by plaintiff, as receiver, against Jenks and others. Nor did the plaintiff's alleged cause of action against the bank and its receivers accrue within six years prior to December 22, 1896, nor within six years prior to the time when plaintiff filed his claim against the bank with the receivers. As a conclusion of law, the trial court directed judgment for the respondents, affirming the disallowance of the claim. The appellant made a motion for a new trial upon the ground that the findings of fact and decision of the court were not justified by the evidence and were contrary to law. The motion was denied, and judgment entered on the findings, from which the appellant appealed.

The only serious question presented by the record is whether the trial court's finding and decision to the effect that the appellant's claim was barred by the statute of limitations are sustained by the evidence. It is true that the respondents raise a further question as to the sufficiency of the pleadings to enable the appellant to avail himself of evidence tending to establish facts which would prevent the statute of limitations from running. But we are of the opinion that the point is not well taken. The informal stipulation of the parties stands in place of a reply, and it must be liberally construed in accordance with the intention of the parties, which, clearly, was to dispense with the necessity for a reply specially pleading the facts; hence any evidence which tended to show that the alleged cause of action was not outlawed was competent.

There is practically no conflict in the evidence bearing upon the question whether or not this action is barred. The doubt, if any, is as to the inferences of fact and law to be drawn from

the evidence. A concise statement of the admitted facts is essential to a correct understanding and decision of the question.

On December 24, 1884, Walker, Judd & Veazie made an assignment for creditors under the provisions of Laws 1881, c. 148, to Austin T. Jenks, who took possession of the assets of the firm, and on May 4, 1885, sold for $100,000 substantially all these assets to a syndicate of five creditors, viz. Bank of Minnesota, the P. H. Kelly Mercantile Company, J. S. Keator Lumber Company, W. A. Culbertson, and J. C. Maxwell, whose claims aggregated approximately seventy per centum of the entire debts of the assignors, and who were sureties on the assignee's bond. This sale was made by a written contract, which was duly reported to the court, and by it confirmed. It was expressly provided by the contract of sale that it was for cash, and that the price was to be paid on delivery of the conveyances and transfers, and by the order confirming the sale Mr. Jenks was only authorized to make the conveyances upon being paid in cash the sum specified in the agreement of sale. Thereafter, and pursuant to this contract and sale, Mr. Jenks conveyed to the syndicate the property sold, and received from them on or prior to July 3, 1885, the whole consideration, except the sum of $8,468.55. The method of making the payments to Mr. Jenks was as follows: The sale for $100,000 included $30,000 cash, leaving $70,000 to be paid. A dividend of forty per cent, was declared about July 3, 1885. Upon the claims held by the syndicate their total dividends amounted to $41,531.-45, and they then, and not before, paid Mr. Jenks' draft of $20,000 to pay the dividends of outside creditors, making $61,531.45 credit on the $70,000, leaving a balance of $8,468.55, no part of which has ever been paid except as hereinafter stated.

The assignment by Walker, Judd & Veazie to Mr. Jenks having been held void (as against nonassenting creditors) by this court in May v. Walker, 35 Minn. 194, 28 N. W. 252, the appellant was appointed, in new insolvency proceedings, receiver of Walker, Judd & Veazie (see In matter of Walker, 37 Minn. 243, 33 N. W. 852, 34 N. W. 591), and in 1893 brought a suit in the district court for Ramsey county against Mr. Jenks and all creditors of Walker, Judd & Veazie, including the members of the syndicate, to deter-

mine the validity of the sale by Mr. Jenks to the syndicate. In this suit a decree was rendered July 17, 1893, holding the sale to be valid, and finding that Mr. Jenks had in his hands as assignee $9,335.94 in cash, which he was directed to pay to Mr. Hiler H. Horton, as receiver of Walker, Judd & Veazie. On August 28, 1893, Mr. Jenks paid to the appellant, as receiver, $867.39 in cash, which he deposited in the Bank of Minnesota, leaving a balance then still due from Mr. Jenks of $8,468.55, which is the basis of appellant's claim in this case against the respondents.

The reason why the purchase price was not actually turned over by the syndicate to Mr. Jenks when he delivered the deeds to them was, according to his uncontradicted testimony, that he agreed to leave the purchase price on deposit with the syndicate, to be paid when and as he was required to disburse it. His testimony on this point was substantially this:

It was the understanding and agreement, inasmuch as seventy per cent. of the dividends would go to the syndicate, that, instead of all of them paying the money to me, and I holding it, I was to call on them for it when the court called on me. Mr. William A. Culbertson [a member of the syndicate] was designated to act for the purchasers, and after his death the Bank of Minnesota acted in his place. The dividends due the purchasers were credited on the purchase price, and I received their receipts for the amount. I issued checks on the Bank of Minnesota for the dividends due the creditors other than the syndicate. This amount was also credited on the purchase price. Q. Was the balance ever paid to you in any way? If so, state how. A. I will start back to the time it went from Culbertson over to the Bank of Minnesota. Instead of my being required to go to Culbertson, as he was dead, I was to go to the Bank of Minnesota for this balance, whenever the court ordered me to pay it over. Q. Who said that to you? A. It was understood and agreed with Mr. Dawson at the bank. We went there, and it was talked over more than once. It was the young Mr. Dawson I had my talk with,—the cashier. In several talks, at different times, I tried to get this matter—some agreement in regard—and I presume that is what you meant. Now, this is as I recollect it away back, and the reply always was: "You can get this money whenever you have to have it. There's seventy per cent. of it, or more, coming to us. Leave it here with us." This talk was in the Bank of Minnesota. "Leave it with us, and when you have to have it we'll pay it." That was the way it was done. Then down a little further my assignment was knock-

ed out. Then it ran along for years, and, of course, no court called on me to pay anything. Whatever I had or had done was left as it stood when the assignment was knocked out. Then this trial of Mr. Horton's that has been spoken of here came up.

After the judgment in favor of the appellant against Mr. Jenks had been entered, and on October 7, 1893, he drew an order directed to the members of the syndicate (naming them), including the Bank of Minnesota, wherein he recited that he had been directed by the court to pay the balance ($8,468.55) of the proceeds of the sale of the property sold to them to the appellant, as receiver, and directed that such balance be paid by them to him. The order also stated that Mr. Jenks' receipt for such payment was in the hands of appellant, to be delivered on such payment being made. This order, with a receipt executed by Mr. Jenks, wherein he acknowledged the receipt of $8,468.55 from the Bank of Minnesota and the other members of the syndicate as the final and full payment for the property sold to them by him as assignee of Walker, Judd & Veazie, was delivered to the appellant. Thereupon the appellant, as testified in substance by him, presented the order and receipt to the cashier of the Bank of Minnesota, and requested that the amount thereof be placed to his credit. The cashier said, in effect, that he would do so. He retained and never returned the order and receipt, and the appellant went his way, believing that the amount of the order had been credited to him as requested, and never learned the contrary until after the bank failed.

There is no substantial contradiction of this evidence. The only semblance of any conflict is the testimony of the cashier, who testified that, as he recollected the matter, Mr. Horton came in, handed him the order, and said, "Here is an order from Mr. Jenks for the $8,400-odd," to which he responded, "All right. I will take it and attend to it." He admitted that the order was left with him, but did not recollect anything about the receipt. As a matter of fact, Mr. Horton was never credited with the amount on the books of the bank, nor did he ever have any bank pass book in which his account as receiver was entered; but he drew checks upon the bank from time to time to the aggregate amount

of $1,657.12 between August 25, 1893, and January 3, 1896, all of which were paid by the bank, making an apparent overdraft of $789.73. No claim or notice, however, was ever made upon or given to Mr. Horton that it was an overdraft, in fact, until after the bank had failed.

The first question suggested by the admitted facts and undisputed evidence to which we have referred is whether the claim of Mr. Jenks against the syndicate was barred prior to the time the Bank of Minnesota was called upon to pay it, on October 7, 1893. If the statute of limitations was not running prior to this date, then the debt was not then barred, and consequently was not barred when appellant filed his claim with the receivers of the bank. This we understand respondents to concede, as it must be. Whether the statute was so running depends upon the terms and legal effect of the arrangement whereby the purchase price for the goods was left in the hands of the syndicate, each member of which was jointly liable for the payment of the whole amount thereof. It is true that this amount was due, by the terms of the written contract, when the deeds transferring the assigned estate were delivered, and parol evidence was not admissible to vary the terms of the contract. But the assignor could, in the absence of any directions of the court, make such arrangement for the keeping of the money arising from the sale as he saw fit. He could keep it in his pocket, or deposit it in a bank or with the purchasers. Whatever arrangement he might make in this respect could not affect the contract of sale nor the rights of creditors, for he and the sureties on his bond would remain liable to comply at all times with the direction of the court for the disbursement of the money.

The only conclusion of fact and law which can be reasonably deduced from the undisputed evidence and admitted facts in this case is that Mr. Jenks left the purchase price on deposit with the purchasers with the agreement that it was to be paid to him upon demand, in fact, as the court directed its disbursement. If the syndicate had actually delivered the purchase price to the assignee when the deeds were delivered, and he had then deposited the money with them, to be paid upon an actual demand, as the court

directed its distribution, there could be no question as to its validity. Now, this hypothesis is the exact legal effect of the agreement of the parties as to the purchase price remaining with the purchasers, for the law requires no needless circumlocution. It looks to the substance, not the form, of a transaction, and it was not necessary for the parties, in order to make a contract for the deposit of the money with the purchasers, that the latter should hand it to the assignee, and he immediately return it to them. It would have been absurdly formal to have done so in this case. In view of the special facts of this case, it would seem that it could not be justly claimed that the arrangement made by the assignee to leave the purchase price in the hands of the purchasers, to be paid upon an actual demand, was a violation of the assignee's official duty; for they were the sureties on his bond, and seventy per cent. thereof, less the expenses, would be returned to them by way of dividends. But, were it otherwise, the purchasers would be bound by the agreement. O'Gorman v. Sabin, 62 Minn. 46, 64 N. W. 84.

This case then falls within the rule that, where it appears from a contract that it was the intention of the parties thereto that the money or claim which is the subject-matter thereof was to be paid upon a demand in fact, the statute of limitations does not begin to run until an actual demand for payment is made. Brown v. Brown, 28 Minn. 501, 11 N. W. 64; Branch v. Dawson, 33 Minn. 399, 23 N. W. 552. The demand in this case was made October 7, 1893. The statute began to run on that day, which was less than six years before the appellant filed his claim with the receivers. Therefore it was not then barred. This renders it unnecessary to determine the precise legal effect of the delivery of the order and receipt for the money by Mr. Jenks to Mr. Horton, and their delivery by the latter to the Bank of Minnesota, and the transaction then had between the bank and Mr. Horton; for, whether it amounted to any equitable assignment of the demand (see Union Iron Works Co. v. Kilgore, 65 Minn. 497, 67 N. W. 1017), or, as it seems to have been, a payment by the bank of the order to Mr. Horton, and a deposit by the latter of the amount with the bank, it is in any event liable, as it owed the debt.

Our conclusion is, and we so hold, that the findings and decision of the trial court to the effect that the plaintiff's claim is barred by the statute of limitations are not sustained by the evidence.

Judgment reversed, and a new trial granted.